UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,

    v.                                    Case No. 15-cr-174-SM-AJ-1
                                     Opinion No. 2025 DNH 124

<u>Mara Morillo</u>,
      Petitioner

## **O R D E R**

Mara Morillo is a citizen of Venezuela.  In May of 2016, pursuant to a plea agreement negotiated with the government, she pled guilty to one count of conspiracy to distribute, and possess with intent to distribute, controlled substances.  She was sentenced to serve 84 months in prison.  Morillo completed her term of incarceration and was released by the Bureau of Prisons.  Subsequently, however, she was taken into custody by Immigration and Customs Enforcement and is currently being detained.  A final order for her removal has issued and the parties have notified the court that her removal is "imminent."

Pending before the court is Morillo's Petition for Writ of Coram Nobis.  In it, she moves the court to vacate her felony drug conviction on grounds that she received ineffective assistance of counsel during plea negotiations.  Morillo also

moved the court to stay her deportation while she challenged the basis for it – her felony drug conviction.  That motion was denied as the court found that it was without jurisdiction to grant it.

Because Morillo's deportation is imminent, on September 25, 2025, the court held an emergency evidentiary hearing.  The following day, the court entered an order granting Morillo's petition, vacating her conviction, and briefly explaining the court's reasoning for doing so.  This order explains that reasoning in more detail.

### Findings of Fact

Morillo was born in San Antonio, Venezuela, in 1975.  When she was three years old, her mother abandoned her and she was sent to live with her paternal great aunt, where she was sexually victimized by two older relatives.  At age 10, she began living with her maternal grandmother.  Later, she moved to Columbia, where she remained until she was 20.  Morillo did well in school and attended a university in Columbia, where she was pursuing a degree in business management.  Her studies were interrupted when she decided to leave that program early to travel to the United States.  In 2016, Morillo came to the United States on a Travel Visa and moved between Florida and New

York and eventually settled in Massachusetts.  Her travel visa
expired in 2017.

Morillo has led an exceedingly difficult life.  Her past
relationships have been characterized as tumultuous, violent,
and sexually abusive.  A psychiatric evaluation conducted in
February of 2016 (the "Reade Report"), states that Morillo has
been diagnosed with depression, anxiety, and panic attacks.
That evaluation reports that Morillo "bears the psychological
scars from the inordinate amount of loss, dislocation, and
adversity she has suffered over the course of her life."
Presentence Investigation Report (document no. 195) (quoting the
Reade Report and Psychological Evaluation).  Her marriage to one
of her co-defendants - Franklyn Morillo - was characterized by
frequent and significant violence that caused her both physical
and emotional trauma.

In September of 2015, a federal grand jury indicted
Morillo, her husband (Franklyn), and four others on drug
charges.  Morillo was charged with a single count of conspiracy.
She was represented by an experienced and well-regarded attorney
with the New Hampshire Federal Defenders Office.  On May 11,
2016, pursuant to a plea agreement with the government (document
no. 84), Morillo pled guilty to conspiracy to distribute, and to

possess with intent to distribute, controlled substances, in
violation of 21 U.S.C. § 846.  That conviction rendered her
immediately and mandatorily deportable, see 8 U.S.C. §
1227(a)(B)(i), and permanently ineligible to reenter the United
States, see 8 U.S.C. § 1182(a)(2)(A)(ii)(II).

In her petition (as supported by her accompanying
affidavit), Morillo claims her defense counsel rendered
ineffective assistance by failing to fully and accurately inform
her of the collateral consequences of her guilty plea -
specifically, that a felony drug conviction would render her
immediately and mandatorily deportable.  According to Morillo,
she made clear to defense counsel that "she did the things she
did because if she didn't Frank would hurt her and the children.
She endured him and his ways because she believed that was what
was needed to survive for her children.  Importantly, she made
it crystal clear that staying in the United States was her
priority."  Petition at 3.  See also Affidavit of Mara Morillo
(document no. 260-4) at paras. 16 and 18.

With regard to Morillo's plea agreement with the
government, she asserts that defense counsel told her that "if
she took the deal, she would do some time but that she would be

<u>able to stay in the United States and work out her immigration</u>
<u>situation once she got out</u>.  He told her that she would be safe
from deportation due to her unique circumstances."  Petition at
para. 21 (citing Morillo Affidavit at paras. 22, 22, 24, and 38)
(emphasis supplied).  <u>See also</u> Morillo Affidavit at para 24
([Counsel] "told me specifically that, if I took the deal, I
would be able to stay here in the United States after I did
whatever the government asked of me and did a reduced minimum
sentence.  He told me a visa could take forever to get but that
I wouldn't be subjected to consequences or deportation."); <u>id</u>.
at para. 38 ("My lawyer directly told me that I would be able to
stay in the United States because of the reduced sentence and
leniency he got me and because I cooperated with police.  He was
completely wrong and his mistake is now ruining my life and
could rip me from my children, 2 of whom are U.S. citizens.").

Finally, Morillo asserts that if she had been properly
apprised of the immigration consequences of her guilty plea, she
absolutely would not have pled guilty and would, instead, have
gone to trial.

> To this day, I don't understand or know the evidentiary
> basis for the charge against me.  I was never shown
> any evidence or reports or given any real
> understanding of the allegations against me.  All I
> knew is my lawyer told me he "got a deal" for me and
> that it was my "only" option.  I did not have the

> foundational knowledge and he did not explain to me
> that I did, in fact, have options.
>
> If I had known that I would be 100% unquestionably
> deportable and could never get lawful status in the
> United States as a result of this "deal," he got for
> me I would never have taken the plea deal.  I would
> have gone to trial.  Specifically because I was
> terrified beyond measure to be deported back to a
> country that I fled in fear, and nothing would have
> convinced me to risk being sent back there.  If I knew
> I could have fought and not taken this deal, there is
> no question I would have.

Morillo Affidavit at para. 18.  See generally Padilla v.

Kentucky, 559 U.S. 356, 368 (2010) ("We too have previously

recognized that preserving the client's right to remain in the

United States may be more important to the client than any

potential jail sentence.").  See also Lee v. United States, 582

U.S. 357, 370 (2017) (noting the "paramount importance" an alien

might naturally place on remaining in the country, regardless of

the criminal penalty they might face by going to trial).


At the emergency evidentiary hearing, a friend of Morillo's

family testified, as did Morillo's daughter.  Both stated that,

consistent with the advice counsel allegedly provided to

Morillo, as well as Morillo's understanding of the immigration

consequences of her plea, she frequently spoke of her plan to

address her immigration status upon her release from prison, to

obtain authorization to work, and to continue her education.

See also Affidavit of Attorney Nayela Esmail (document no. 278-3) at paras. 3-5 ("I was consulted by Mara Morillo several months ago for the purpose of straightening out her legal status.  Ms. Morillo believed she was eligible for adjustment . . . [and] was laboring under the misconception that she would be able to obtain status and explain her prior criminal conviction as long as she hired an attorney to handle it and that it would not render her ineligible to obtain lawful status.") (emphasis supplied).

Morillo's defense counsel also appeared at the emergency hearing, but testified that he had no specific recollection of Morillo, her case, or the advice he provided to her.  He did note, however, that his typical practice was to explore the potential immigration consequences of a client's guilty plea and routinely shared those findings with his clients so they would be fully informed when making any decision about accepting a plea offer.  Nevertheless, even assuming he followed that practice, it is entirely uncertain whether he advised Morillo generally that a guilty plea "might" result in her deportation or whether, as required by Padilla, he properly informed her that such a plea would "certainly" result in deportation.

Despite the legally incorrect advice Morillo claims to have received from defense counsel, she was certainly informed - on two occasions - that her guilty plea would almost certainly lead to her deportation: in the sentencing memorandum counsel prepared on her behalf and at her sentencing hearing.

> **Sentencing Memorandum and Request for Variance** (document no. 189). In support of his argument in favor of a variant sentence, defense counsel wrote that, "Morillo is facing a lengthy prison sentence, with <u>almost</u> <u>certain</u> <u>deportation</u> at the end of that sentence. She will be deported to Venezuela with three small children." <u>Id</u>. at 8 (emphasis supplied).

> **Sentencing Hearing.** At Morillo's sentencing hearing, in support of his argument in favor of a variant sentence of 48 months, defense counsel noted that, "the other thing is that <u>she's going to be deported</u> when she's - when the sentence is over. As you could tell from Dr. Reade's report, it's kind of a very fractured, unstable situation where she's going to go, and she's not going to have any choice but to go there." Transcript of Sentencing Hearing (document no. 267) at 25 (emphasis supplied).

While it is unclear whether Morillo ever read the sentencing memorandum (that seems unlikely), she was present at sentencing when counsel argued on her behalf.

Despite the unambiguous language used by her counsel in his sentencing memorandum and at oral argument on sentencing, Morillo says that advice came far too late, long after she had already pled guilty. Rather, she says, the relevant advice

given to her is that which <u>preceded</u> her decision to plead guilty, since that is the only advice that could have informed and influenced her decision.  Moreover, says Morillo, the legal advice given to her prior to her decision to plead guilty was incorrect and entirely inconsistent with the holding in Padilla. First, she points to the incorrect advice she says was provided by her counsel assuring her that her conviction would not result in deportation.  Next, she points to the language of her plea agreement and the court's Rule 11 colloquy - neither of which complied with the requirements of Padilla.

> **Morillo's Written Plea Agreement.**  The plea agreement contains a paragraph, entitled "Collateral Consequences," which states that if Morillo "is not a citizen of the United States, she may be removed from the United States, denied citizenship, and denied admission to the United States in the future as a consequence of her conviction."  Id. at para. 11 (emphasis supplied).

> **Change of Plea Hearing.**  At the change of plea hearing, counsel for the government specifically asked the court to inquire of Morillo to determine whether she understood the immigration consequences of her guilty plea.  In response, the following exchange took place.

>> THE COURT:  You're not a citizen of the United States?

>> THE DEFENDANT:  No.

>> THE COURT:  All right. Do you understand that a conviction, pursuant to your plea of guilty, could result in immigration consequences that may include deportation?  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you understand, in other words, by admitting this offense and then subsequently being convicted, that conviction <u>may be taken into account by the government</u> in determining whether or not to deport you? Do you understand that?

THE DEFENDANT: Yes.

Transcript of Change of Plea Hearing (document no. 266) at 17-18 (emphasis supplied).

Those conditional and somewhat vague statements were entirely <u>consistent</u> with Morillo's claimed understanding of the situation (based on counsel's alleged misadvice) and reinforced her belief that her conviction would <u>not</u> automatically result in deportation and she would have the opportunity, upon release from prison, to address her immigration status.  Even assuming that counsel had previously warned Morillo that her guilty plea would necessarily result in her deportation, the equivocal language in her plea agreement as well as that employed by the court was not consistent with <u>Padilla</u> and almost certainly clouded Morillo's understanding of the consequences of her plea.

To be sure, courts have concluded that proper advice from the court can "purge" any taint caused by defense counsel having earlier provided legally incorrect advice to their client. Here, however, neither the court's advice to Morillo at her

change of plea, nor the language of the plea agreement, served

to do so.  Rather, the language of the plea agreement and the

court's colloquy with Morillo exacerbated the situation by

affirmatively giving the legally incorrect impression that

Morillo's conviction might not lead to her deportation – that it

was an open and unresolved question.  It was not.  That advice

was categorically wrong and inconsistent with the requirements

of Padilla.


Some time after her release from prison, in August of 2021,

Morillo received a Notice of Intent to Issue a Final

Administrative Removal Order (document no. 278-1).  According to

Morillo,

> After serving time, I had no reason to question my
> lawyer's advice.  I complied with all the requirements
> of my sentencing and for all this while it appeared
> that my lawyer's advice was correct.  I was in
> America, my ex-husband was in jail, and things seemed
> to go back to normal.  I re-started my life and had no
> problems with immigration.  The government never sent
> me papers about my visa, but at the same time, for a
> long while, immigration never bothered me either.  I
> figured my lawyer was right about it all – taking a
> long time, but that I would be spared from anything
> negative.
>
> However, on August 23, 2021, I received a notice of
> deportation.  I was initially confused and tried to
> get in touch with my old lawyer.  I could not.  I
> naturally figured this was a mistake.  I went to one
> immigration lawyer who told me there was nothing I
> could do.  I went to another – same thing.  I wanted

> answers as to why this was happening when I already
> had made a deal with the government.

Morillo Affidavit at para. 33.  After trying unsuccessfully to
reach her trial counsel and then speaking with two other
lawyers, Morillo lacked the financial resources to contact any
other attorneys.  But, in February of 2025 (with the aid of
borrowed funds), Morillo "spoke with an immigration lawyer who
explained to me the consequences of my conviction.  I was then
referred to Stephanie McClure [Morillo's counsel of record]."
Id. at para. 34.  Morillo further testified that,

> Ms. McClure is a criminal lawyer who explained to me
> that my conviction would make it 100% impossible for
> me to ever get status in the United States.  The
> supposed "deal" that the lawyer told me was my "only
> option" to stay and to get leniency was not: in fact,
> it is exactly the opposite.

> Ms. McClure explained to me that the conviction
> immediately and forever made me mandatorily deportable
> and inadmissible to the U.S.  Not only could I not get
> my papers, but if I left or get deported, I cannot
> even come back to visit my children.  This was and
> still is absolutely life-changing, devastating news.

Id. at para. 35.  Since meeting with her current counsel,
Morillo has acted promptly to vacate her underlying criminal
conviction and to correct her current immigration status (she
has filed a Form I-360, Petition for Special Immigrant (document
no. 278-2) and also sought relief from deportation through a

petition for asylum).  See Affidavit of Attorney Nayela Esmail
at para. 13.


As noted earlier, Morillo filed a petition for writ of
coram nobis in which she argues that she received
constitutionally deficient assistance of counsel.  On that
basis, she moved the court to vacate her felony drug conviction.[1]


**Governing Law**

I.   Coram Nobis.

The writ of coram nobis is an extraordinary common law writ
that serves as a remedy of last resort to correct errors of the
most fundamental character in a criminal case.  See Aceituno v.
United States, 132 F.4th 563, 569 (1st Cir. 2025); Murray v.

---

[1]    In addition to claiming that counsel failed to adequately
explain the immigration consequences of her plea, Morillo also
plausibly alleges that counsel provided constitutionally
deficient representation by failing to adequately explore the
possibility that Morillo is "actually innocent" of her crime of
conviction.  Specifically, she says "a plethora of available
evidence of extreme and unrelenting domestic abuse negated a
conspiracy and the requisite elements of mens rea."  Reply
Memorandum (document no. 272) at 7.  The evidence of record to
support such a defense is largely undeveloped, but there are
police reports documenting Franklyn Morillo's repeated physical
abuse of her and a psychological report that does the same.  The
record as it currently stands is inadequate to establish
ineffective assistance in that regard, but what evidence exists
lends credence to defendant's assertion that she would have gone
to trial had she known of the Padilla consequences of her plea,
and would have had a plausible defense to assert.

United States, 704 F.3d 23, 28 (1st Cir. 2013); United States v.
George, 676 F.3d 249, 251 (1st Cir. 2012).  It is typically
available to criminal defendants who are no longer in custody
and for whom the remedies of 28 U.S.C. § 2255 are no longer
available.  Trenkler v. United States, 536 F.3d 85, 98 (1st Cir.
2008).  This court has jurisdiction to issue the writ pursuant
to the All Writs Act, 28 U.S.C. § 1651.

To demonstrate entitlement to such an extraordinary remedy,
Morillo must make a three-part showing:

> First, she must explain her failure to seek relief
> from her conviction earlier, in a more timely and
> traditional manner; and
>
> Second, she must show that she continues to suffer
> significant collateral consequences from her
> conviction; and
>
> Finally, she must demonstrate that her conviction
> resulted from an error of the most fundamental
> character.

See, e.g., Murray v. United States, 704 F.3d 23, 29–30 (1st Cir.
2013); United States v. George, 676 F.3d 249, 254 (1st Cir.
2012).

Importantly, even if Morillo satisfies her burden and
demonstrates each of the three essential elements necessary for
coram nobis relief, that is not sufficient: she must still

persuade the court that justice demands the extraordinary relief
sought.  See Murray, 704 F.3d at 29 ("Even if the petitioner
meets all three of the conditions in the coram nobis eligibility
test, the court retains discretion to grant or deny the writ,
depending on the facts and circumstances of the individual case.
Satisfying the three-part test is a necessary, but not a
sufficient, condition for the issuance of the writ.") (citations
and footnote omitted); United States v. Castro-Taveras, 841 F.3d
34, 39 (1st Cir. 2016) ("[Even when the three requirements are
satisfied, the court retains discretion to deny the writ if the
petitioner fails to show that justice demands the extraordinary
balm of coram nobis relief.") (citation omitted).

    The court notes that Morillo can meet the third element of
the test - that is, showing that her conviction resulted from an
error of the most fundamental character - by demonstrating that
her guilty plea was the product of constitutionally deficient
legal advice from her counsel (as she seeks to do here).  See,
e.g., Williams v. United States, 858 F.3d 708, 712 (1st Cir.
2017) ("To be sure, such constitutionally deficient
representation, if true, can function as the rock upon which a
petitioner can build her coram nobis church."); Kovacs v. United
States, 744 F.3d 44, 49 (2d Cir. 2014) ("ineffective assistance
of counsel is one ground for granting a writ of coram nobis.").

That, in turn, requires her to meet the test articulated in Strickland v. Washington, 466 U.S. 668, 688 (1984).


II.  Ineffective Assistance of Counsel.

To succeed with an ineffective assistance of counsel claim, "a petitioner must show both that his counsel's representation fell below an objective standard of reasonableness (the performance prong) and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (the prejudice prong)." Casey v. United States, 100 F.4th 34, 42–43 (1st Cir. 2024) (citation and internal punctuation omitted).  Additionally, Morillo must demonstrate that, but for the erroneous advice of counsel, she would not have accepted the government's plea offer and would, instead, have gone to trial.  See, e.g., Torres-Estrada v. United States, 122 F.4th 483, 494 (1st Cir. 2024). See also Hill v. Lockhart, 474 U.S. 52, 59 (1985).


The Supreme Court has held that counsel's failure to advise a client of the deportation consequences attendant to a felony drug conviction is, as a matter of law, constitutionally deficient.

> Immigration law can be complex, and it is a legal
> specialty of its own.  Some members of the bar who

represent clients facing criminal charges, in either
state or federal court or both, may not be well versed
in it.  There will, therefore, undoubtedly be numerous
situations in which the deportation consequences of a
particular plea are unclear or uncertain.  The duty of
the private practitioner in such cases is more
limited.

When the law is not succinct and straightforward . . .
a criminal defense attorney need do no more than
advise a noncitizen client that pending criminal
charges may carry a risk of adverse immigration
consequences.  But when the deportation consequence is
truly clear, as it was in this case, the duty to give
correct advice is equally clear.

Padilla v. Kentucky, 559 U.S. 356, 369 (2010) (emphasis
supplied).  Here, as in Padilla, it was clear that Morillo would
be subject to automatic and mandatory deportation upon her
conviction.  See 8 U.S.C. § 1227(a)(2)(B)(i).  See also Padilla,
559 at 360, 368 (describing 8 U.S.C. § 1227(a)(2)(B)(i) as
making an alien convicted of certain drug offense subject to
"automatic deportation" and stating that the statute "commands
removal").

**Discussion**

I.   Timely Relief.

To satisfy this element, Morillo must explain her failure
to seek relief from her conviction earlier, in a more timely and
traditional manner (for example, through a 2255 petition while
she was still in custody) and that she exercised due diligence.
The court concludes that she has done so.

17

Based upon the alleged advice rendered by her trial counsel, as well as the incorrect and conditional language in both the plea agreement and the court's Rule 11 colloquy describing the immigration consequences of her guilty plea, Morillo had no reason to pursue 2255 habeas relief while she was incarcerated.  And, once she was released and served with the Notice of Removal, she attempted (unsuccessfully) to contact her criminal defense counsel.  She then consulted two attorneys for assistance, but received none and then ran out of money.  As soon as she was able to afford proper counsel (with the benefit of borrowed funds), she consulted an immigration attorney and promptly filed the pending action, submitted a petition to immigration authorities to adjust her status, and filed an application for asylum.

There is no suggestion that Morillo slept on her rights or delayed taking action once she fully and properly appreciated that nature of her circumstances and the mandatory consequences of her guilty plea.

II.  <u>Continuing Collateral Consequences</u>.

There can be no doubt that Morillo is suffering from collateral consequences of her decision to plead guilty.  Her

conviction makes her both mandatorily deportable and permanently inadmissible to the United States.  That conviction also stands as the sole obstacle to obtaining a change in her current immigration status pursuant to her currently-pending application for lawful status as a "self petitioner" under the Violence Against Women Act.  See generally Affidavit of Attorney Stephanie McClure (document no. 278).  See also VAWA petition and exhibits (document no. 278-2).

III.  Fundamental Error (Ineffective Assistance).

   A.   Counsel's Advice was Constitutionally Deficient.

   There are two means by which to conclude that trial counsel rendered ineffective assistance of counsel.  First, crediting Morillo's unambiguous and essentially uncontested testimony, counsel affirmatively misrepresented the immigration consequences of Morillo's guilty plea when he assured her that her conviction would not make her deportable and she could, upon release from prison, make the necessary applications to alter her immigration status.  Given the circumstances presented, such advice was, as a matter of law, constitutionally deficient.  See Padilla, 559 U.S. at 369.  And, as discussed earlier, the testimony of Morillo's daughter and family friend was entirely

19

consistent with Morillo's claim that she received legally
incorrect advice about the consequences of her plea.[2]

   Moreover, counsel's understandably vague testimony about
the advice given to Morillo is simply insufficient for the court
to conclude that it met the minimum constitutional requirements
articulated in <u>Padilla</u>.  That is to say, even if counsel <u>did</u>
follow his typical practice and discussed the immigration
consequences of Morillo's plea with her, still the record does
not support the conclusion that he specifically told her that
her conviction would absolutely lead to her deportation.   It is
just as likely that he warned her that it "might" or "may" or
"could" or "probably would" prompt her deportation.   Indeed
that scenario might explain Morillo's steadfast recollection
that he told her that her conviction would <u>not</u> prompt certain
deportation (and the witnesses' testimony that Morillo
repeatedly spoke of her plan to obtain lawful status upon her
release from prison).

---

[2]    The court describes Morillo's testimony on this point as
"essentially uncontested" because her trial counsel testified
that he could not recall any details of Morillo's criminal case,
nor could he recall the specific advice he gave her regarding
the immigration consequences of her decision to plead guilty.
What arguably stands in weak opposition to Morillo's testimony
is counsel's statement that it was his "customary practice" to
properly advise clients of the immigration consequences of a
conviction and, when such a conviction could lead to
deportation, to warn them of the same.

At stake in this litigation is Morillo's fundamental
constitutional right to effective assistance of counsel, as well
as her ability to remain with her family in this country, pursue
lawful status, and avoid removal to a dangerous and uncertain
future in Venezuela.  Given the circumstances, Morillo has
demonstrated (and the court so finds) that her unwavering and
absolutely certain recollection of the events in question is
more reliable than her counsel's lack of any specific
recollection at all (and the government's suggestion that
counsel's "typical practice" was, in this specific case,
adequate to meet the exacting requirements of Padilla).

B.   Counsel Failed to Correct the Mistaken Legal
     Advice Morillo Received in the Plea Agreement and
     the Court's Colloquy.

Moreover, counsel did nothing to correct the misleading
legal advice given to Morillo in both the written plea agreement
and the court's Rule 11 colloquy.  Given the importance of
insuring that his client clearly and unmistakably understood
that she would absolutely be deported upon her conviction, and
given her unequivocally-articulated goal to remain in the United
States at all costs, counsel had an obligation to her to correct
those mistaken, conditional statements.  His failure to do so

fell below the constitutionally-mandated standard of
reasonableness.

To be sure, courts can purge any taint associated with
misinformation provided by counsel by clearly and correctly
informing a defendant of the immigration consequences of his or
her plea.  See, e.g., United States v. Murillo, 927 F.3d 808,
819 (4th Cir. 2019) (noting that "a district court can, by
accurately informing a defendant of the immigration consequences
of his plea, cure an attorney's incorrect advice").  Critically,
however, that is not what occurred in this case.  Rather than
clarifying and correcting any potential confusion about the
mandatory consequences of Morillo's plea, both the plea
agreement and the court's colloquy only added to that confusion.

The court of Appeals for the Fourth Circuit confronted an
analogous situation, involving misadvice from an attorney and an
insufficiently clear statement of the law from the court, noting
that:

> A defendant may be unable to show prejudice if at the
> Rule 11 proceeding the district court provides an
> admonishment that corrects the misadvice and the
> defendant expresses that he understands the
> admonishment (citing United States v. Foster, 68 F.3d
> 86, 88 (4th Circ. 1995).

* * *

The case before us is decidedly different.  Unlike
Foster, the district court's admonishment was far from
a "careful explanation" of the consequences of
deportation.  Instead, the district court warned that
Akinsade's plea *could* lead to deportation.  This
general and equivocal admonishment is insufficient to
correct counsel's affirmative misadvice that
Akinsade's crime was not categorically a deportable
offense.  More importantly, the admonishment did not
"properly inform" Akinsade of the consequence he faced
by pleading guilty: mandatory deportation.

United States v. Akinsade, 686 F.3d 248, 253-4 (4th Cir. 2012)

(emphasis supplied).  See also United States v. Murillo, 927

F.3d at 819 ("[T]he district court's warning that Appellant 'may

be deported' was insufficient to cure [counsel's] misadvice that

his crime was not a categorically deportable offense.").


The Court of Appeals for the Ninth Circuit reached a

substantially similar conclusion:

Here, the court's advisement and the statements in the
plea agreement that Rodriguez-Vega faced the
possibility of removal did not purge prejudice, if for
no other reason than that they did not give her
adequate notice regarding the actual consequences of
her plea.  The plea agreement and plea colloquy, like
the advice of her lawyer, each notified Rodriguez-Vega
only that there existed a possibility of removal, when
in fact her removal was virtually certain.  The plea
agreement stated that "Defendant recognizes that
pleading guilty *may* have consequences with respect to
her immigration status." (Emphasis added.)  While
warning of a dire consequence, the plea agreement
characterizes its *likelihood* only as something that
"may" happen.

> Warning of the possibility of a dire consequence is no
> substitute for warning of its virtual certainty.  As
> Judge Robert L. Hinkle explained, "Well, I know every
> time that I get on an airplane that it could crash,
> but if you tell me it's going to crash, I'm not
> getting on."

United States v. Rodriguez-Vega, 797 F.3d 781, 790-91 (9th Cir.

2015) (quoting United States v. Choi, Case No. 4:08-CV-00386-RH,

Transcript, Docket No. 96, at 52 (D.Fla. Sept. 30, 2008)).


Here, even if defense counsel did properly warn Morillo

that she would face mandatory deportation upon acceptance of her

guilty plea, he had an ongoing obligation to correct any

equivocal and legally incorrect statements about those

consequences coming from the government (in the plea agreement)

or the court (at the Rule 11 colloquy).  Counsel was likely not

required to notify the court or the government of those

misstatements of law.  He was, however, obligated to discuss

those incorrect statements of the law with Morillo, make clear

that she should not be confused or misled by them, and reiterate

that if she were to pursue a plea agreement with the government

her subsequent conviction would unquestionably and inevitably

lead to her deportation.  The record on that point is clear and

undisputed: he failed to meet that obligation by neglecting to

remedy Morillo's potential confusion, reiterate the warning of

mandatory deportation, or disabuse Morillo of any false hope she

might have entertained that she would be able to address her
immigrations status after her conviction, and potentially
remain.

Finally, the court concludes that Morillo has amply
demonstrated that if she had not been misadvised of the
consequences of her plea, she would not have pled guilty and
would, instead, have proceeded to trial.  See, e.g., Affidavit
of Mara Morillo (document no. 260-4), at paras. 16, 18.  Again,
the record on that issue is unambiguous and undisputed.
Indeed, had Morillo proceeded to trail, the record evidence
fairly shows that she could have advanced a plausible defense to
the charge against her based upon coercion, diminished capacity,
and/or battered wife syndrome.  And, such a defense would have
been independent of whatever incriminating evidence the
government had relating to the elements of the offense charged.
While perhaps only a plausible defense, defendant likely would
have taken a chance, to preserve a possibility of remaining with
her children.

IV.  <u>Demands of Justice</u>.

Even though Morillo has met her obligation to establish the
first three elements necessary to obtain coram nobis relief, she

must still demonstrate that awarding such relief is consistent
with the demands of justice.  She has met that burden.

By all accounts, Morillo has lived an extraordinarily
difficult life, punctuated by multiple, extended periods of
sexual abuse and physical violence.  Indeed, there is a
plausible argument that she lacked the requisite mens rea to be
guilty of her crime of conviction based upon diminished mental
capacity and/or battered wife syndrome.  Vacating the conviction
for which she has fully served her incarcerative sentence would
remove the sole obstacle to her ability to correct her
immigration status and become a lawful resident of the United
States.  It would also prevent her imminent deportation to
Venezuela, without a hearing on the merits on the criminal
charge, and separation from her children who reside in the
United States – at least two of whom are U.S. citizens.

Additionally, the court notes that if Morillo were deported
to Venezuela, not only would she be forced to leave her children
behind, but she would forever be barred from returning to this
country to visit them.  Lastly, the court notes that conditions
in Venezuela are decidedly unsafe and Morillo has expressed an
entirely credible fear of returning there.  Indeed, the U.S.
State Department has issued a "Level 4 – Do Not Travel" advisory

with respect to Venezuela, noting a "high risk of wrongful detention, torture in detention, terrorism, kidnapping, arbitrary enforcement of local laws, crime, civil unrest, and poor health infrastructure" and warning that "violent crimes, such as homicide, armed robbery, kidnapping, and carjacking, are common in Venezuela."

Given the totality of circumstances, the demands of justice counsel strongly in favor of granting Morillo's petition.

## Conclusion

The writ of coram nobis is a rarely granted, extraordinary remedy.  But, as the court noted in its prior order, "rarely" is not synonymous with "never."  It is available under limited and compelling circumstances to correct fundamental errors that occurred in a criminal case, with a significant emphasis on achieving justice.  This case presents one of those rare circumstances in which issuance of the writ is warranted.  The very prejudice defendant sought to avoid at all costs - deportation - was rendered mandatory by her plea, a plea she would not have offered had she been correctly advised of its mandatory consequences.

For the reasons discussed, as well as those set forth in a Morillo's legal memoranda (document no. 272) and the court's prior order on this matter (document no. 279), the court granted Morillo's Petition for Writ of Coram Nobis (**document no. 260**) and vacated her conviction in <u>United States v. Morillo</u>, no. 15-cr-174-SM-AJ-1.

        **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 15, 2025

cc:  Counsel of Record
     U.S. Probation
     U.S. Marshal